<u>**NOT FOR PUBLICATION**</u>

<u>**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**</u>

|  |  |  |
|---|---|---|
| CUSHMAN & WAKEFIELD, INC., CUSHMAN & WAKEFIELD OF MICHIGAN, INC., | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | |
| VALLEY NATIONAL BANCORP, VALLEY NATIONAL BANK, and MELLON TRUST OF NEW ENGLAND, N.A. f/k/a BOSTON SAFE DEPOSIT AND TRUST COMPANY, | : : : : : : | Civil Action No. 02-6099 (JAG)  **OPINION** |
| Defendant. | : : | |
| VALLEY NATIONAL BANCORP and VALLEY NATIONAL BANK, | : : : : | |
| Third-Party Plaintiffs, | : : | |
| v. | : : | |
| WILLIAM F. MARCELLINO, INTERIOR SYSTEMS, INC., C&W ISI JOINT VENTURE, | : : : : : | |
| Third-Party Defendants. | : : | |

**<u>GREENAWAY, JR., U.S.D.J.</u>**

This matter comes before this Court on the motion for summary judgment, pursuant to

F<small>ED</small>. R. C<small>IV</small>. P. 56, of Defendants Valley National Bancorp ("Bancorp"), Valley National Bank

1

("Valley"), and Mellon Trust of New England, N.A. f/k/a Boston Safe Deposit and Trust Company ("Mellon") (collectively, "Defendants") against the claims brought by Plaintiffs Cushman & Wakefield, Inc. ("C&W") and Cushman & Wakefield of Michigan, Inc. ("C&W Michigan") (collectively, "Plaintiffs").  For the reasons set forth below, the motion will granted.

## INTRODUCTION

This case arises from the events surrounding the opening of a bank account with Valley by Third-Party Defendant William F. Marcellino, or his agent.  Specifically, Plaintiffs allege that Marcellino opened a business checking account with Valley under the name "C&W/ISI JV Operating Account (the "Venture Account").  Plaintiffs allege that Marcellino opened the account by submitting an application to Valley without providing the appropriate "partnership" documents.  Plaintiffs argue that Valley's alleged negligence in allowing Marcellino to open the Venture Account resulted in Plaintiffs suffering damages.  Specifically, Plaintiffs allege that the Venture Account allowed Marcellino and an accomplice to launder money from accounts that were intended for use by, among others, the United States Postal Service ("USPS").  The United States of America (the "Government") filed suit against Plaintiffs and Marcellino, in the Northern District of Texas, for actions related to the money laundering scheme.  Plaintiffs settled this lawsuit for $7,200,000.00, and allege that Defendants are responsible, at least in part, for that settlement payment.  Defendants, after a long procedural history, filed the instant motion for summary judgment.

## BACKGROUND

I. **Factual Background**

In January 1997, C&W entered into a contract with a third party to provide mail sorting

services at a facility in Dallas, Texas (the "Presort Facility").  C&W contracted with businesses with large volumes of mail, and presorted that mail at the Presort Facility, presented that mail to the USPS.  Customers of the operation paid C&W a fee for sorting the mail and C&W, as the mailer, was responsible for paying the postage due on the mailings.  (Defendants' Statement of Undisputed, Material Facts in Support of Motion for Summary Judgment ("Defs.' SUMF"), at ¶ 11.)[1]  The Postal Service opened two accounts with Boston Safe Deposit, currently Mellon (the "BSD Accounts").  C&W funded the accounts with monies paid by customers of the Presort Facility.  The USPS deducted the postage due from the accounts based on special forms that the operator of the Presort Facility submitted to the USPS.  (Defs.' SUMF, at ¶ 12.)

In 1997, C&W and Marcellino, an officer of ISI, hired Ralph Ebert ("Ebert") to serve as general manager of the Presort Facility.  (Certification of John C. Barnoski, Esq. ("Barnoski Cert.") Ex. B (September 8, 2004 Trial Transcript from WFM Associates, Inc. v. Cushman & Wakefield, Inc. (the "WFM Action")), at 180; Barnoski Cert. Ex. D (September 10, 2004 Trial Transcript of the WFM Action), at 54.)  During the Spring of 1997, Marcellino learned of Ebert's prior conviction and incarceration for mail fraud.  (Barnoski Cert. Ex. B, at 181-82.)

On March 25, 1999, C&W Michigan and ISI entered into a Limited Purpose Joint Venture Agreement (the "JV Agreement").  (Barnoski Cert. Ex. E.)  The JV Agreement sets forth, in pertinent part, that the joint venture was "for the limited purpose of providing real estate and related facility services, on an assignment by assignment basis, to publicly and privately held

---

[1] Defendants' SUMF was not filed electronically.  However, Plaintiffs cite to Defendants' SUMF verbatim in their opposition document, "Cushman & Wakefield, Inc. and Cushman & Wakefield of Michigan, Inc.'s Response to Defendant[s' SUMF]".  The absence of Defendants' SUMF on CM/ECF is, therefore, a clerical error, and this Court cites to it as though it had been correctly filed.

3

for profit entities, as well as federal, state, and local government entities." (Barnoski Cert. Ex. E.) The JV Agreement established that the name of the joint venture between C&W Michigan and ISI (the "Joint Venture") would be "C&W ISI." (Barnoski Cert. Ex. E, at § 1.1.)

Pursuant to the JV Agreement, all assets of the Joint Venture would be held under the "C&W ISI" name. (Barnoski Cert. Ex. E, at § 1.1.) The principal place of business and address of the Joint Venture was listed on the JV Agreement as "915 15th Street N.W., Second Floor, Washington, DC 20005, Attention: Earl R. Jenkins, President, Interior Systems, Inc." (Id.) The JV Agreement also set forth the procedures for opening a checking account for the Joint Venture: "The [parties to the agreement] shall establish a Venture Checking Account at a federally-insured depository institution approved by the [parties.] Any funds drawn on said Venture Account shall require the approval and the signature of an officer of C&W [Michigan] designated in writing by C&W [Michigan] and an officer of ISI designated in writing by ISI." (Id., at § 4.1.)

Section 5.1 of the JV Agreement provided that "the [parties to the agreement] may only undertake an obligation or incur a contractual liability pursuant to a written document executed by Earl R. Jenkins and William F. Marcellino on behalf of ISI and O.B. Upton and John C. Santora on behalf of C&W [Michigan] or such other authorized officer(s) as C&W Michigan may from time to time designate." (Id., at § 5.1.) Pursuant to a Consent and Operating Agreement entered into between C&W Michigan and ISI (the "Operating Agreement"), ISI assumed operation of the Presort Facility on August 1, 1999. (Barnoski Cert. Ex. F (the Operating Agreement).)

On July 28, 1999, Susan Krommenhoek ("Krommenhoek") opened an account on behalf of the Joint Venture, in the name "C&W/ISI JV Operating Acct" (the "Venture Account").

(Barnoski Cert. Ex. G (Response by ISI to Plaintiff's First Set of Combined Discovery, Interrogatory No. 3). Joanne Stellman ("Stellman"), a former branch manager at Valley, opened the Venture Account as a "partnership account." (Barnoski Cert. Ex. H (Signature Card for Venture Account).) At the time the account was opened, Valley's internal procedures required the following documentation in order to open a business account for a partnership: 1) Partnership Agreement; 2) a Trade Name Certificate filed with the county (if applicable); 3) partnership's tax identification number; 4) resolution regarding bank accounts and procurement of loans (a Valley form); 5) corporate resolution (a Valley form); 6) a signature card (a Valley form). (Barnoski Cert., Ex. J (Valley internal document entitled "Account Titles for Business Relationships").)

Krommenhoek provided several documents in opening the account, in varying degrees of completeness. These documents included: 1) a Consent and Operating Agreement dated August 1, 1999 (the "Operating Agreement") between C&W Michigan and ISI;[2] 2) a Corporate Certificate issued by the Michigan Department of Treasury indicating that C&W Michigan was incorporated in Michigan, dated August 16, 1967; 3) a copy of the articles of incorporation of C&W Michigan, dated August 14, 1967; 4) an IRS Notice dated April 1, 1999 setting forth the Employer Identification Number to the Joint Venture; 5) a copy of Suzanne Billetz's New Jersey Driver's License;[3] 6) a copy of Marcellino's New Jersey Driver's License; 7) a copy of the Washington, DC Driver's License of Daniel Marshall, a principal of ISI; 8) a copy of the Maryland Driver's License of Earl Robert Jenkins, a principal of ISI.

---

[2] This document was actually provided to the bank three days after the date the account was opened.

[3] Billetz was Marcellino's secretary.

The signature card identified the Joint Venture improperly as "C&W/ISI JV", not its proper name "C&W ISI." (Barnoski Cert. Ex. H.) The signature card also listed Marcellino as the managing partner and incorrectly identified the mailing address of the Joint Venture. (Barnoski Cert. Ex. H.) Valley did not obtain a copy of the Joint Venture Agreement in opening the account.

On or about August 16, 1999, Ebert sent Marcellino a check in the amount $500,000.00, which was drawn on the BSD Accounts and was made payable to "Cushman & Wakefield/I.S.I." (Barnoski Cert. Ex. M (copy of the check).) The check was deposited in the Venture Account on August 25, 1999, with an endorsement to Bill Marcellino by C&W/ISI – in essence endorsed to Marcellino by Marcellino on behalf of the Joint Venture. On September 21, 1999, Ebert sent Marcellino a second check in the amount of $587,662.33. (Barnoski Cert. Ex. N (copy of the second check).) This check, as well, was drawn on the BSD Accounts and was made payable to "Cushman & Wakefield/I.S.I." (Barnoski Cert. Ex. N.) The check was deposited on October 1, 1999 and endorsed by Marcellino to Valley for deposit only in the Venture Account. (Barnoski Cert. Ex. N.) A third check was sent on November 9, 1999, in the amount of $500,000.00. (Barnoski Cert. Ex. O (a copy of the third check).) On November 17, 1999, Marcellino, or someone on his behalf, deposited the check, payable from one of the BSD Accounts and payable to "Cushman & Wakefield/I.S.I.", into the Venture Account. (Barnoski Cert. Ex. O.)

The three checks totaled $1,587,622.00. Approximately $979,000.00 of the total amount was deposited in accounts held by Marcellino, personally. (Barnoski Cert. Ex. C (September 9, 2004 Trial Transcript of the WFM Action), at 29:1 to 35:16.)

The Government, as a result of an investigation into the activities of Marcellino and Ebert

6

in the Presort Facility, filed a false claim civil action in the Northern District of Texas, styled U.S. v. Cushman & Wakefield, Inc. et al., Civil Action No. 3:01-cv-2342 (the "Texas Action"). (Barnoski Cert. Ex. P (Complaint in the Texas Action).)  C&W, C&W Michigan, ISI, and Marcellino were the defendants.  (Id.)  C&W and C&W Michigan filed cross-claims against ISI and Marcellino, as well as a third-party complaint against Bank of America, Mellon, and Boston Safe Deposit.  (Barnoski Cert. Ex. Q (First Amended Third-Party Complaint of C&W and C&W Michigan).)

The Texas Action ended when C&W agreed to pay $7,200,000.00 and, separately, ISI and Marcellino agreed to pay $1,005,000.00.  By Stipulation and Agreed Order of Dismissal and Transfer ("Stipulation"), dated December 30, 2004, C&W and C&W Michigan agreed to the dismissal of the majority of the claims set forth in the First Amended Third Party Complaint, and the transfer of certain claims against Mellon to the District of New Jersey.  (Barnoski Cert. Ex. R. (Stipulation dated December 30, 2004).)

## II.  Procedural History

Plaintiffs initially filed a Complaint with this Court, on or about December 24, 2002, asserting claims against defendants Valley and Bancorp.  (Barnoski Cert. Ex. P (the Complaint).) Defendants filed an answer and third-party complaint against ISI and Marcellino, on February 14, 2003.  (Barnoski Cert. Ex. S (Answer and Third Party Complaint).)  The parties later agreed upon a Consent Order that resulted in an Amended Complaint being filed on November 3, 2005, adding Mellon as a defendant and asserting claims against Mellon for conversion.  (Barnoski Cert., Ex. U (the Amended Complaint).)  On November 23, 2005, Defendants filed their amended answer.  (Barnoski Cert. Ex. V (the Amended Answer).)  On March 10, 2006,

Defendants filed the instant motion.

The Amended Complaint contains four counts. Count One alleges negligence on the part of Defendants Valley and Bancorp for failing to open and maintain the Venture Account, appropriately. Count Two demands contribution and/or indemnification, in the event that Defendants Valley and Bancorp are found to be negligent. Count Three requests a declaratory judgment, in the event Plaintiffs are successful in pursuing their negligence claim, holding Defendants Valley and Bancorp liable for any settlement and all costs and attorneys' fees in the Texas Action. Count Four alleges conversion by Defendant Mellon.

## **LEGAL STANDARD**

### I.  **Summary Judgment**

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the

essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).

## DISCUSSION

### I.  Initial Matters

During the hearing on this motion, the parties conceded several issues. First, Plaintiffs abandoned their claims against Bancorp, the parent of Valley. (T3:23-24.) Plaintiffs also conceded that C&W is no longer a necessary party. (T45:4-16.) Therefore, Valley National Bancorp shall be removed as a defendant and as a third-party plaintiff, and Cushman and Wakefield, Inc. shall be removed as a plaintiff.

Plaintiff also abandoned any conversion claims that may have been alleged in the Complaint against Defendant Valley. (T21:10-15.) ("I would agree that we're outside the time [for a] conversion claim with Valley National Bank."). Thus, the sole remaining claims for this Court's consideration are against Defendant Valley for negligence and against Defendant Mellon for conversion on the checks.

### II.  Mellon

Defendant Mellon was added as a defendant in the Amended Complaint filed on November 3, 2005. Count Four of the Amended Complaint alleges that Mellon committed conversion when it "wrongfully made or obtained payment with respect to the [three USPS checks] for a person not entitled to enforce the instrument or receive payment, including Marcellino and ISI." Mellon argues that any conversion claim against it fails because of UCC § 3-420(c).

>    Uniform Commercial Code Section 3-420(c) states that
>
>    [a] representative, other than a depository bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the person entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.

Thus, if a drawee bank has paid the entire amount of the check to the depository bank, then the drawee bank has no liability to the payee, in conversion. Here, it is undisputed that Mellon a) is a drawee bank, and b) paid the entire face amounts of the checks to Valley. Thus, Mellon has no proceeds of the checks in its possession, and, therefore, cannot be liable in conversion to plaintiff, as a matter of law.

Plaintiff's sole argument against the application of UCC § 3-420(c) is that Defendants failed to plead this section of the Code in their amended answer, and, therefore, waived this defense. The failure to so plead, Plaintiff argues, prejudices Plaintiff because it "may have pursued an alternative legal strategy, and plaintiffs may [have] taken additional discovery related to [this] defense[]." This Court disagrees.

FED. R. CIV. P. 8(c) lists nineteen defenses that must be pleaded affirmatively. A defense under UCC § 3-420(c) is not one of those enumerated nineteen. Further, this defense does not fit under the definition of "any other matter constituting an avoidance or affirmative defense." FED. R. CIV. P. 8(c). Section 3-420(c) addresses an element of the claim of conversion: possession. The drawee bank, Mellon, paid the entire amount of the checks over to Valley, and, therefore, the crucial element of possession for a negligence claim is lacking. Section 3-420(c) of the UCC codifies this concept. Thus, Section 3-420(c) is more akin to a defense or denial under FED. R. CIV. P. 8(b). See Ford Motor Co. v. Transport Indem. Co., 795 F.2d 538, 546 (6th Cir. 1986)

("some defenses negate an element of the plaintiff's prima facie case; these defenses are excluded from the definition of affirmative defense in FED. R. CIV. P. 8(c)"). Because Section 3-420(c) is not an affirmative defense, this Court cannot find that the failure to plead it in the Amended Answer constitutes waiver. Thus, this Court finds that Plaintiff's conversion claim against Mellon, found in Count Four of the Amended Complaint, fails as a matter of law.

### III. Negligence Claims Against Valley

The remaining Counts of the Amended Complaint – Counts One, Two, and Three – stem from Plaintiff's allegation of common law negligence on the part of Defendant Valley in opening and maintaining the Venture Account.

To establish negligence under New Jersey law, a plaintiff must establish that 1) the defendant owed plaintiff a duty of reasonable care; 2) the defendant breached that duty; 3) that the breach constituted a proximate cause; and 4) that plaintiff was injured. Keith v. Truck Stops Corp. of America, 909 F.2d 743, 745 (3d Cir. 1990). Plaintiff must establish each of these factors before a Court may make a finding of negligence. See id. These factors are conjunctive.

#### A. Defendant Valley Owed No Duty of Care to Plaintiff C&W Michigan

Defendant Valley argues, without dispute from Plaintiff, that "the question of whether a duty [of care] exists [for a bank to a noncustomer] is a matter of law to be decided by the courts," and is "an inquiry that ultimately involves a weighing of the relationship of the parties, the nature of the risk, and the public interest [involved]." City Check Cashing, Inc. v. Manufacturers Hanover Trust Co., 166 N.J. 49, 59 (2001). The City Check Court held that "in the check collection arena, unless the facts establish a special relationship between the parties created by agreement, undertaking[,] or contract, that gives rise to a duty, the sole remedies available [to a

12

noncustomer in suing a bank] are those provided in the [Uniform Commercial] Code." City Check, 166 N.J. at 62. Thus, Defendant Valley argues that, as a matter of law, a noncustomer cannot maintain a common law negligence claim against a bank absent such a special relationship. Plaintiff responds that there are genuine issues of material fact as to whether C&W Michigan was a "customer" of Valley.

Plaintiff argues that Stellman, the Valley employee who opened the Venture Account, testified that she knew that the Joint Venture was comprised of separate entities. (Barnoski Cert. Ex. I, at 34:15-18 and 40:5-8.) Plaintiff further argues that Valley was in possession of several documents that identify C&W Michigan as an owner and beneficiary of the account, including a) a copy of C&W Michigan's Corporate Certification, b) a copy of C&W Michigan's Articles of Incorporation, and c) a copy of the Joint Venture's Operating Agreement, which specifically identified C&W Michigan as a partner of Joint Venture. (Barnoski Cert. Ex F.) Plaintiff also argues that Defendant's proposed expert testified that Valley took steps to identify the members of the Joint Venture. (See Certification of James J. Kreig, Esq. ("Kreig Cert."), Ex. A, at 23).

Defendant responds to these arguments by noting that C&W Michigan never provided to Valley any documents necessary to open the account. Defendant further argues that C&W Michigan never signed a signature card at Valley, never provided a taxpayer identification form to Valley, and never provided a corporate resolution to Valley. Finally, Defendant argues that C&W Michigan could not have been a customer of Valley, because C&W Michigan was not even aware that an account existed until the underlying fraud perpetrated by Marcellino was uncovered.

Defendant's analysis is correct. First, whether a party is a customer or noncustomer

13

under the UCC is a question of law. Thus, Plaintiff's arguments suggesting that there is at least a genuine issue of material fact on this matter are misplaced. The UCC, as set forth in N.J. STAT. ANN. 12A:4-104(a)(5), defines a bank customer as "a person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank." The UCC defines account as "any deposit or credit account with a bank, including a demand, time, savings, passbook, share draft, or like account, other than an account evidenced by a certificate of deposit." N.J. STAT. ANN. 12A:4-104(a)(1).

In spite of Plaintiff's arguments that the Valley knew or should have known that C&W Michigan was a partner in the Joint Venture, the fact remains that at the time the account was opened, the Joint Venture was a separate legal entity.[4] The only two possible "customers" that could be defined based on the Venture Account would be the Joint Venture or Marcellino (who opened the account through his agent, Ms. Krommenhoek). Even if this Court were to accept the argument that the account was not opened on behalf of the Joint Venture, the result would not be that C&W Michigan was a "customer"; instead, the result would be that Marcellino and Krommenhoek fraudulently opened an account with the name of an entity that does not exist. The fact that Marcellino invoked C&W Michigan's name in his fraudulent enterprise does not elevate C&W Michigan to customer status. Under any possible application of the facts to the definition under the UCC, C&W Michigan is not a "customer" of Valley.

The only theory under which Valley would owe a duty to C&W Michigan is as a noncustomer. To establish this theory, the facts set forth must establish a special relationship

---

[4] Pursuant to the Venture Agreement, the Joint Venture had its own name, its own assets, and its own principal place of business. (Barnoski Cert. Ex. E, at § 1.1.)

(defined as an agreement, undertaking, or contact) between Valley and C&W Michigan. City Check Cashing, 166 N.J. at 60. "An agreement is essentially a meeting of the minds between two or more parties on a given proposition." Id. at 62 (citing BLACK'S LAW DICTIONARY 44 (6th ed. 1991)). "An undertaking is the willing assumption of an obligation by one party with respect to another or a pledge to take or refrain from taking particular action." Id. (citing BLACK'S LAW DICTIONARY 1060 (6th ed. 1991)). "A contact is the loosest of the three terms, defined as the 'establishment of communication with someone.'" Id. (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 282 (9th ed.1984)). The City Check Court went on to state that "an agreement and an undertaking will give rise to a duty with respect to the subject agreed upon or undertaken," and "whether a contact creates a duty is determined by its nature and surrounding circumstances." Id.

Plaintiff does not make an argument that a special relationship exists based on an agreement because there is no evidence in the record indicating that such an agreement exists. Instead, Plaintiff argues that Valley "undertook to open the Venture Account on July 28, 1999." (Pl.'s Opp. Br. 19.) Plaintiff also argues that "although C&W Michigan may not have initiated any contacts with Valley['s] partner in the Joint Venture – ISI – provided Valley [] with documents and information which, under the circumstances, [] constitute "contacts" between C&W Michigan and Valley." (Pl.'s Opp. Br. 19.)

Plaintiff's arguments seek to stretch the definitions of undertaking and contact too far. As set forth in City Check Cashing, an undertaking involves a "willing assumption of a duty." Nothing set forth in the record indicates any communications regarding this account between C&W Michigan and Valley. This Court will not hold that Valley willingly assumed a duty to a

15

company with which it had no direct communications.  Further, if Valley willingly assumed any duty in opening the Joint Venture Account, that duty would be to the Joint Venture, a separate legal entity, or to Marcellino, as induced by his fraud.

Plaintiff's argument that the Marcellino and Krommenhoek's actions in opening the account are "contacts" between Valley and C&W Michigan is equally unappealing, for the same reasons.  Valley and C&W Michigan had no communications regarding this account until the fraud, perpetrated by Marcellino, was uncovered.  Marcellino and Krommenhoek's proffering of documents to open the account are the actions of either a) an agent of the Joint Venture or b) Marcellino acting on his own behalf, fraudulently, in the name of the Joint Venture.  This Court finds that there is no genuine issue of material fact which needs to be resolved, regarding whether a "special relationship" between C&W Michigan and Valley exists.

"Absent a special relationship, courts will typically bar claims of noncustomers against banks."  City Check Cashing, 166 N.J. at 60.  "In short, in the check collection arena, unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the Code."  Id.

While City Check Cashing deals with a factual scenario in the check collection area of banking, the analysis set forth therein applies equally to Valley's situation at hand.  C&W Michigan is not a customer of Valley, nor does Valley owe C&W Michigan a duty based on any special relationship.

Plaintiff cites to no cases in which a New Jersey court, or any court, has held that a bank owes a duty of care to a noncustomer with whom the bank has no communication or contact.  In responding to cases utilized by Defendant in its motion papers, Plaintiff argues that several courts

16

have recognized the possibility that a duty is owed by a bank to a noncustomer plaintiff who is the named owner of the account – even if the name on the account is obtained fraudulently. See Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220 (4th Cir. 2002) (holding that a noncustomer plaintiff who was convinced to wire money to an account opened by defendant in the name of Bear Stearns was not owed a duty, but opining that a duty **may** have been owed to Bear Stearns) (emphasis added); see McCallum v. Rizzo, 1995 WL 1146812 (Mass. Sup. Ct., Oct. 13, 1995) (holding that noncustomer plaintiff convinced to wire money into an account opened by defendant in the name of the Paul Tsongas Campaign Committee was not owed a duty by the bank, but opining that the "analysis . . . might well give rise to a duty owed by the Bank to the Tsongas Committee, the known named entity for whose benefit the account was ostensibly being opened and maintained").

This Court rejects that possibility in this matter. First, these cases are not New Jersey cases, and, therefore, are not dispositive in this matter. Second, neither court actually decided that a noncustomer, in whose name an account was opened, was owed a duty. Both courts merely opined as to that possibility. And finally, the cases do not apply to the facts here. The account was opened in the name of the Joint Venture; a separate legal entity from Plaintiff.

This Court finds that, as a matter of law, a) C&W Michigan was not a "customer," as defined by the UCC, and b) C&W and Valley had no special relationship. Further, no other persuasive argument was set forth by Plaintiff for a duty of care owed by Valley to Plaintiff. As such, this Court finds as a matter of law Valley owed no duty to C&W Michigan. In the absence of a reasonable duty of care owed to C&W Michigan, liability for negligence cannot be found, based on the conjunctive requirement set forth earlier for a negligence claim.

## **CONCLUSION**

At oral argument, Plaintiff abandoned all its claims in this matter against Bancorp. Therefore, Defendant Bancorp's motion for summary judgment is granted on all counts. Plaintiffs also conceded that C&W is no longer a necessary party. Thus, Plaintiff C&W shall be removed as a party. Finally, Plaintiff abandoned its conversion claim against Defendant Valley.

As to Count Four, the conversion claim against Mellon, Defendants have demonstrated that "there is no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Judgment is entered in favor of Defendant Mellon on the sole count of the Complaint against it: Count Four.

Finally, as to the remaining claim for negligence against Defendant Valley in Count One, Defendant Valley has demonstrated that "there is no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Further, as conceded by Plaintiffs at oral argument (T31:23 to T32:10.), if summary judgment is granted on Count One of the Complaint, Counts Two and Three also fail. Summary judgment is granted for Defendant Valley as to Counts One, Two, and Three.

                                                           S/Joseph A. Greenaway, Jr.
                                                           JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: April 11, 2007